No. 01-537

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 101

ROBERT L. NELSON and
MARILYN H. NELSON,

      Plaintiffs and Appellants,

  v.

FARMERS UNION MUTUAL
INSURANCE COMPANY,

      Defendant and Respondent.

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and for the County of Cascade, ADV-94-614
                The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

          Tony P. Lucas, Seidlitz Law Office, Great Falls, Montana

      For Respondent:

          Joseph M. Sullivan, Emmons & Sullivan, Great Falls, Montana

Submitted on Briefs:  March 14, 2002

Decided:  April 24, 2003

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     On June 6, 1994, Marilyn and Robert Nelson (Nelsons), brought an action against their insurer, Farmers Union Mutual Insurance Company (Farmers) in the Eighth Judicial District Court, alleging Farmers had violated Montana's Unfair Trade Practices Act (MUTPA). Following a bench trial, the District Court entered judgment in favor of Farmers on all claims. We affirm.

¶2     Nelsons present the following issues on appeal:

1. Whether the District Court abused its discretion by allowing Farmers' counsel to testify at trial;

2. Whether the District Court erred in its interpretation of the insurance contract; and

3. Whether the District Court erred in its interpretation of MUTPA.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3     The homeowners insurance policy that Nelsons purchased from Farmers provided coverage for their residence in Cascade, Montana, from June 15, 1990 to June 15, 1991, and included replacement value coverage. On July 2, 1990, a hail storm hit Cascade, causing damage to the siding on Nelsons' home and garage.

¶4     The first appraisal of damage was prepared on July 30, 1990, by Gene Dolezal (Dolezal) of First General Services of Montana (First General), who estimated that replacing Nelsons' damaged siding would cost $40,562.71. Apparently, First General was providing appraisals at no charge to many Cascade residents after the storm. In September of 1990, Gary Humble (Humble), an adjuster for Farmers, concluded Nelsons' siding did not require

2

replacement, and estimated the damage to be in the amount of $2,588.00. Based on these inconsistent estimates, a dispute arose between the parties as to the appropriate amount of coverage owed the Nelsons.

¶5     On October 11, 1990, Farmers' claims manager, Gary Bickler (Bickler) informed Nelsons that Farmers wished to invoke the appraisal clause of the insurance policy. The appraisal clause provided that if the parties were unable to agree on the amount of loss, either could demand an appraisal of the costs. Upon invocation of this clause, each party had twenty days to select a competent appraiser and advise the other party of its choice. The appraisers then had fifteen days to choose an umpire who would resolve any dispute between them. If the appraisers could not agree on an umpire, either party could request the choice be made by a judge.

¶6     Nelsons disputed whether Farmers could name an appraiser under the appraisal clause. Apparently, Nelsons contended that the bids already submitted by Humble and First General fulfilled the appraisal requirement as contemplated by the clause. For over a year, the parties disagreed over Farmers' right to choose an appraiser, and how the clause should be implemented. As of January 15, 1991, Nelsons considered Dolezal--the appraiser who completed the initial estimate in July 1990, for First General--to be their appraiser, while Farmers had selected Cal Hoiland (Hoiland). However, an umpire was not determined by the appraisers as provided for in the appraisal clause.

¶7     Hoiland inspected Nelsons' property and issued an appraisal on January 28, 1991. According to Hoiland, there was no apparent damage on the hardboard siding. He estimated

3

the total damage to be in the amount of $3,480.00. Based on that appraisal, on or about June 6, 1991, Farmers offered Nelsons the sum of $2,980.00 ($3,480.00 less a $500.00 deductible). Although Nelsons accepted and kept this payment upon re-issuance of the check in August of 1991, they maintained the estimate was invalid, arguing that it failed to cover the total loss suffered.

¶8 Nelsons continued to disagree about implementation of the appraisal clause, and in October of 1991, District Court Judge John McCarvel (Judge McCarvel) was asked to select an umpire and determine whether Humble or Hoiland should be considered Farmers' appraiser under the appraisal clause. On November 18, 1991, Judge McCarvel agreed with Farmers, concluding that under the appraisal clause, Hoiland was properly designated, and noted that at that time, Nelsons' choice of appraiser was still Dolezal. In this ruling, Judge McCarvel also selected an umpire.

¶9 For the next sixteen months, between November 18, 1991, and March 3, 1993, the parties undertook the joint appraisal process. However, the process was delayed for various reasons. First, Nelsons disagreed that McCarvel's choice of umpire was binding. Next, Nelsons' appraiser moved and became unavailable, and finally, once definitively chosen, the appraisers had trouble getting together.

¶10 During this time frame, Nelsons filed a complaint against Farmers in the Eighth Judicial District Court on July 1, 1992, seeking payment in addition to the $2,980.00 already received, for damage to their property. This particular cause of action is separate from the instant cause and will be referred to as Nelson I.

4

¶11    Finally, in March of 1993, Hoiland (Farmers' appraiser) and Chuck Olson (Olson) (Nelsons' second appraiser) undertook a joint appraisal. On March 12, 1993, Hoiland and Olson submitted a joint appraisal letter on the damage to Nelsons' property, determining the repair costs to be $11,834.00. The letter explained that while the siding had aged and faded, it "appear[ed] to be the same color on all facades, and seem[ed] sound and serviceable." The letter added that the original siding could not be matched since it was no longer available, but noted that not all the siding showed hail damage. The joint appraisers stated that the suggested estimate "will pay the cost of a good professional paint job, or for good new pre-finished siding material to cover both buildings. Siding installation costs to be paid by [Nelsons] -- their choice." (Emphasis in original.)

¶12    By letter dated March 24, 1993, Nelsons rejected this joint appraisal because it did not take into account the replacement labor costs associated with removal of the old siding and installation of the new siding, which they argued they were entitled to recover under their policy. The letter stated that "[i]f we are unable to resolve the extent of the insurer's duty under the March 12, 1993 appraisers' report, I [Nelsons' counsel] will proceed with service of the Complaint filed in this matter." Nelsons did not make a demand for payment based on the joint appraisal estimate of $11,834.00.

¶13    Within a month, arrangements were made for Olson to submit a bid for the labor and materials required to replace the siding; however, Olson later declined to give the bid. Although Farmers made arrangements for two other contractors to submit bids, Nelsons refused to allow the contractors on their property. Apparently, Nelsons believed that

Farmers should rely on the July 1990 estimate prepared by First General, which included replacement costs, and as such, Nelsons questioned the necessity of additional bids. Between August 5, 1993, and March 17, 1994, Farmers sought authorization from Nelsons for contractors to make their bids, but Nelsons continued to refuse them access to their property. Finally, on March 17, 1994, Nelsons agreed to allow two contractors to view their property and make bids.

¶14 On May 3, 1994, Bill Peterson (Peterson), one of the contractors chosen, provided a preliminary bid, but was asked to resubmit the bid with additions and corrections. Peterson's revised bid of $46,002.09 was received on June 27, 1994. Both parties accepted Peterson's revised bid, thus settling Nelsons' claim in Nelson I, and on July 14, 1994, Farmers tendered a check to Nelsons in the amount of $42,522.09, which together with the $2,980.00 and the $500 deductible, totaled $46,002.09. On July 22, 1994, Nelson I was dismissed with prejudice.

¶15 However, on June 6, 1994, prior to receiving Peterson's revised bid, Nelsons filed the underlying complaint in this case (Nelson II), alleging Farmers violated MUTPA, specifically §§ 33-18-201(2), (3), (4), (6) and (7), MCA. According to Nelsons, Farmers had refused to pay the damages suffered by Nelsons in spite of the estimates provided. Nelsons sought money damages for mental anguish and emotional distress, punitive damages, and costs and attorney fees.

¶16 The bench trial in Nelson II commenced on February 20, 2001. Prior to trial, the court determined that the only remaining claims left to be resolved were a claim for "loss of

6

use of money" and a derivative claim seeking punitive damages. Moreover, the District Judge stated on the record prior to hearing testimony that "there's going to be no claim for wrongful conduct, alleged wrongful conduct prior to the March 12th [1993] date." Nelsons concurred with this statement.

¶17 Nelsons called Humble, Bickler, Robert Stainsby (Stainsby), a former claims representative with Farmers, and Marilyn Nelson (Marilyn) to testify. We recount only that testimony that is directly relevant to the issues presented for review.

¶18 Significantly, Marilyn confirmed during her testimony that no claim was being made for any conduct on the part of Farmers prior to March 12, 1993, when the joint appraisal was obtained.

¶19 Bickler, Farmers' claims adjuster, told the court that Robert Emmons (Emmons) was involved as Farmers' counsel as of Fall, 1990, and added that Farmers funneled everything through Emmons and relied on Emmons' guidance in making any decisions.

¶20 Stainsby, who was a former field claims representative with Farmers with over thirty years of experience, testified on behalf of Nelsons. In Stainsby's opinion, ninety days was a reasonable time frame to settle most hail damage claims. However, Stainsby did concede that he had no experience with appraisal clauses and he agreed that his ninety-day estimation may not apply in situations when an appraisal clause is invoked or if the claim moves into litigation. Stainsby told the court that in his opinion, the March 12, 1993 joint appraisal letter established that there was in fact hail damage to the siding, and given that Nelsons' policy included replacement value, Stainsby concluded that a reasonable adjuster would

7

understand that the necessity of replacement was obvious, and would figure it so. However, Stainsby also agreed that if the parties are in the midst of litigation, it would change the ability to get things done in that time frame, and stated that "in litigation anything is reasonable."

¶21 Following its motion for a directed verdict, which the District Court took under advisement, Farmers called Emmons--the attorney representing Farmers throughout these proceedings--as its first witness. Nelsons objected, noting that Emmons had never been listed as a witness, and argued that allowing him to testify would be prejudicial. The District Court continued the trial until the next day, ordered Emmons to be available for deposition, and reopened discovery to allow Nelsons an opportunity to review Emmons' correspondence file. The trial resumed the next morning, at which time the parties stipulated that Emmons' file would be admitted as an exhibit. Emmons went on to testify without objection from Nelsons.

¶22 Emmons described the various reasons behind the ongoing disputes between the parties primarily by reviewing the correspondence already admitted as exhibits. Of the forty-eight months it took to resolve the matter (July, 1990 until July, 1994), Emmons attributed forty-one months to either Nelsons, their counsel, or other factors out of Farmers' control. Emmons told the court that he had managed the case, directing the efforts and actions of Humble and Bickler throughout Nelson I and Nelson II.

¶23 Farmers' final witness was Jalmer Carlson (Carlson). Carlson, who had worked in the insurance business for nearly thirty years, with several years of experience in property

damage adjusting, was qualified as an expert. In Carlson's opinion, the amount of the hail loss was in dispute following the joint appraisal in March of 1993. Carlson explained that in light of the dispute, it was not only reasonable, but also prudent for Farmers to get bids on the additional costs. Carlson testified that under the appraisal clause, had the joint appraisal been accepted, Farmers would have had sixty days to pay the $11,834.00 estimate. However, according to Carlson, once Nelsons disagreed with the joint appraisal, there was no longer a valid appraisal in place, and the sixty-day requirement no longer applied. Finally, based upon his review of Nelsons' policy, the claims file, depositions, and trial testimony, Carlson testified that in his opinion, Farmers' actions did not violate MUTPA.

¶24 On June 29, 2001, the District Court issued its Findings of Fact, Conclusions of Law and Order in favor of Farmers. The court concluded that Nelsons had conceded they had no claims under §§ 33-18-201(2), (3), and (7), MCA, and had also conceded that no allegedly wrongful conduct on the part of Farmers occurred prior to March 12, 1993. As to Nelsons' claims under §§ 33-18-201(4) and/or (6), MCA, the court concluded there was a total failure of proof of any unreasonable delay or investigation on the part of Farmers, and a failure of proof that Farmers failed to effectuate prompt, fair, and equitable settlement. The court alternatively concluded that Nelsons' claims under §§ 33-18-201 (4) and (6), MCA, were controlled by *Palmer v. Farmers Ins.* (1993), 261 Mont. 91, 861 P.2d 895 (conduct occurring after initiation of litigation is inapplicable to a bad faith action, except when post-filing conduct relates to or confirms wrongful conduct by an insurer which occurred before litigation began). Thus, the court concluded that because Farmers' allegedly wrongful

9

conduct occurred after <u>Nelson I</u> was initiated, there was no admissible factual basis for claims of violations of §§ 33-18-201 (4) and (6), MCA. The court entered its Judgment in favor of Farmers on July 18, 2001. It is from these rulings that Nelsons appeal.

**STANDARD OF REVIEW**

¶25    Admissibility of evidence is within the sound discretion of the district court, and will not be reversed absent an abuse of discretion. *Superior Enterprises v. Montana Power Co.*, 2002 MT 139, ¶ 6, 310 Mont. 198, ¶ 6, 49 P.3d 565, ¶ 6 (citing *Massman v. City of Helena* (1989), 237 Mont. 234, 240, 773 P.2d 1206, 1211).

¶26    The interpretation of an insurance contract is a question of law. *State Farm Mut. Auto. Ins. Co. v. Ferrin*, 2002 MT 196, ¶ 11, 311 Mont. 155, ¶ 11, 54 P.3d 21, ¶ 11 (citing *Pablo v. Moore*, 2000 MT 48, ¶ 12, 298 Mont. 393, ¶ 12, 995 P.2d 460, ¶ 12. This Court reviews a conclusion of law to determine whether it is correct. *State Farm*, ¶ 11 (citation omitted). Finally, questions of statutory interpretation and application are reviewed for correctness. *In re Estate of Kuralt*, 2001 MT 153, ¶ 11, 306 Mont. 73, ¶ 11, 30 P.3d 345, ¶ 11 (citing *In re A.W.*, 1999 MT 42, ¶ 6, 293 Mont. 358, ¶ 6, 975 P.2d 1250, ¶ 6).

**DISCUSSION**

**Issue 1**

¶27    **Did the District Court abuse its discretion by allowing Farmers' counsel to testify at trial?**

¶28    When Farmers called Emmons to testify, it erroneously believed he was listed as a witness. Following Nelsons' objection that Emmons had never been listed, Farmers moved

10

to amend the pre-trial order to add Emmons as a witness. Nelsons objected to the motion, arguing prejudice. Nelsons further contended that when asked in interrogatories who had authority to settle the claim on behalf of Farmers, Farmers objected under the attorney-client privilege. Thus, argued Nelsons, they did not attempt to depose Emmons, and added that if they had known he would be called as a witness, they would have asked to review his file beforehand. Farmers responded that because it was clear that Farmers was acting on advice of counsel, Nelsons could not claim surprise.

¶29 After noting that Nelsons had a valid argument concerning the lack of full discovery, the District Court continued the trial and reopened discovery, thus allowing Nelsons an opportunity to depose Emmons and review the correspondence file that Emmons would rely on during his testimony. When the trial resumed the following morning, the District Court, after noting that the previous day it had granted Farmers' motion to add Emmons as a witness, "with the understanding that certain files would be made available to [Nelsons]," inquired whether "that's all been taken care of," and both parties responded that it was. Nelsons then stipulated to admitting Emmons' correspondence file as an exhibit, and Emmons went on to testify--notably, without any objection from Nelsons.

¶30 On appeal, Nelsons claim the court abused its discretion when it allowed Emmons to testify. They claim that Farmers interposed the attorney-client privilege during discovery, and argue their pretrial preparation and trial strategy were prejudiced when Emmons was allowed to testify. However, "it has long been the rule of this Court that on appeal we will not put a [d]istrict [c]ourt in error for a ruling or procedure in which the appellant

11

acquiesced, participated, or to which appellant made no objection." *Kinsey-Cartwright v. Blower*, 2000 MT 198, ¶ 19, 300 Mont 450, ¶ 19, 5 P.3d 1026, ¶ 19 (quoting *Green v. Green* (1978), 176 Mont. 532, 536, 579 P.2d 1235, 1237). *See also*, *Matter of R.B.O.* (1996), 277 Mont. 272, 283, 921 P.2d 268, 275.

¶31 As indicated above, when Nelsons initially objected to Emmons being called as a witness, the District Court took steps to abate any prejudice to Nelsons by continuing the trial and reopening discovery. Significantly, when trial resumed the following day, not only did Nelsons fail to raise or renew their objection to Emmons' testimony, but they also stipulated to admitting Emmons' correspondence file. We cannot find fault with the District Court for allowing Emmons to testify when Nelsons' actions indicated agreement and acquiescence with the court's resolution of their initial objection to Emmons' testimony.

¶32 We have repeatedly held that in order to preserve an objection to the admission of evidence for purposes of appeal, the complaining party must make a timely objection or motion to strike and state the specific grounds for its objection. *Schuff v. Jackson*, 2002 MT 215, ¶ 30, 311 Mont. 312, ¶ 30, 55 P.3d 387, ¶ 30 (citing *Kizer v. Semitool, Inc.* (1991), 251 Mont. 199, 207, 824 P.2d 229, 234). For an objection to be timely, it must be made as soon as the grounds for the objection are apparent and failure to make a timely objection constitutes waiver of the right to claim error on appeal. *Schuff*, ¶ 30 (citation omitted). Moreover, when a party did not renew its objection after the trial court modified a jury instruction in response to that party's objection, we held the issue was not properly preserved for appeal. *Ahmann v. Am. Fed. Sav. & Loan Ass'n.* (1988), 235 Mont. 184, 195-96, 766

12

P.2d 853, 860 (overruled on other grounds by *Allers v. Riley* (1995), 273 Mont. 1, 901 P.2d 600). The record here reflects no renewed objection to Emmons' testimony following the court's resolution of Nelsons' initial objection.

¶33 Finally, Nelsons failed to establish any prejudice or surprise resulting from Emmons' testimony. Nelsons contend that Farmers' failure to disclose Emmons as a witness significantly diminished development of their trial strategy and preparation for Emmons' testimony and cross-examination. However, review of the record indicates the District Court provided Nelsons sufficient opportunity to depose Emmons and review his correspondence file, which was not extensive and contained many of the same letters already admitted into evidence. For the foregoing reasons, we conclude the District Court did not abuse its discretion in allowing Emmons to testify at the trial.

**Issue 2**

¶34 **Did the District Court err in its interpretation of the insurance contract?**

¶35 Nelsons contend the District Court erred in concluding that Farmers complied with the payment terms of the insurance contract, arguing that Farmers failed to effectuate prompt settlement within the allotted sixty-day time limit when according to Nelsons, it was faced with clear liability. While Nelsons' argument is not altogether clear, it appears they are contending that the joint appraisal established that Nelsons' siding was in fact damaged by the hail and further assert that Farmers should have relied on the July 1990 First General appraisal for determining replacement costs. Nelsons contend that Farmers never disputed the amount or reasonableness of the First General estimate, but instead contested only

13

whether the siding was in fact damaged by the hail. In reply, Farmers contends it was reasonable to seek current bids for replacement costs from contractors, and argues that the sixty-day time period runs if there is a valid appraisal. It argues that once Nelsons contested the joint appraisal, there was no "valid appraisal" to trigger the sixty days.

¶36    The evidence establishes that the joint appraisal did not definitively conclude that the siding was so damaged that it required replacement. In fact, the joint appraisal suggested the $11,834.00 could be used to either professionally paint the buildings or apply new pre-finished siding with the installation costs to be paid by Nelsons.

¶37    More to the point, Nelsons' arguments in this regard are inherently inconsistent. Nelsons appear to promote a strict interpretation of the policy in contending that Farmers failed to meet the sixty-day requirement. Were we to agree with them, the ultimate effect would be to reduce Nelsons' loss recovery from $46,002.09 to $11,834.00. In other words, requiring compliance with the sixty-day time period would trump Nelsons' rejection of the joint appraisal and their ultimate receipt much later of $46,002.09. Clearly, this is not the relief Nelsons want.

¶38    Nelsons' insurance policy includes the following relevant provisions:

> **Appraisal**. If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the residence premises is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, *the amount agreed upon will be the amount of loss*. If they fail to agree, they will submit their

14

differences to the umpire. A decision agreed to by any two will set the amount of loss. [Emphasis added.]

**Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. *Loss will be payable 60 days after we receive your proof of loss and*:
  a. *reach an agreement with you*;
  b. *there is an entry of a final judgment; **or***
  c. *there is a filing of an appraisal award with us.*
[Emphasis added.]

¶39    For the sixty-day time period to apply, Nelsons needed to provide a "proof of loss," and either (a), (b), or (c) of the "Loss Payment" clause had to also occur. Given the lengthy dispute over the amount of damages, the significant disparity between the estimates, and Nelsons' rejection of the joint appraisal, it is clear that the parties did not reach the "agreement" called for in subsection (a), such as would trigger the sixty-day provision. Nor was there an entry of final judgment or a filing of an appraisal award with Farmers following the joint appraisal. The March 12, 1993 joint appraisal did not constitute an agreement between the parties, given Nelsons' contention that the appraisal omitted replacement costs and Farmers' efforts to obtain bids for such costs in light of that rejection. Therefore, we conclude the District Court did not err when it declined to conclude Farmers should have made payment to Nelsons within sixty days of the joint appraisal. Accordingly, we conclude that based on the record before us, the District Court did not err in interpreting the insurance contract between Nelsons and Farmers.

**Issue 3**

¶40    **Did the District Court err in its interpretation of MUTPA?**

15

¶41    Nelsons appear to take issue with the court's conclusions of law regarding its application of MUTPA and *Palmer*. Nelsons contend they incurred damages, including "loss of use of money" for a period of thirteen months, which, they argue, was the result of Farmers' violation of MUTPA. They claim this violation occurred throughout the truncated appraisal process. As part of their argument, Nelsons contend that continuing good faith does not necessarily render evidence of an insurer's post-filing conduct inadmissible, citing *Federated Mut. Ins. Co. v. Anderson*, 1999 MT 288, 297 Mont. 33, 991 P.2d 915. Nelsons also contend, apparently in an attempt to distinguish *Palmer*, that based on Emmons' time sheets, Emmons was not in fact controlling the litigation for Farmers.

¶42    However, Nelsons' argument ignores a significant finding of fact that has not been challenged on appeal--the District Court found that Nelsons' claim against Farmers was limited to alleged wrongful conduct on the part of Farmers occurring *after* March 12, 1993, a finding in which Nelsons specifically concurred. We therefore limit our discussion of this issue to conduct on the part of Farmers <u>after</u> the joint appraisal was received. We also note that Nelsons do not dispute the court's conclusion that there were no viable claims under §§ 33-18-201(2), (3), and (7), MCA, and accordingly address only the claims under §§ 33-18-201(4) and (6), MCA.

¶43    MUTPA provides in pertinent part that

No person may, with such frequency as to indicate a general business practice, do any of the following:
. . .
(4) refuse to pay claims without conducting a reasonable investigation based upon all available information; [or]

16

. . .
(6) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;
. . . .

Section 33-18-201, MCA. A violation of this provision gives rise to an independent cause of action pursuant to § 33-18-242, MCA. However, "[a]n insurer may not be held liable under this section if the insurer had a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue." Section 33-18-242(5), MCA.

¶44 Significantly, we note that both the experts, including Nelsons' own witness, Stainsby, testified that it was reasonable for Farmers to investigate additional replacement costs in light of Nelsons' rejection of the joint appraisal, and also that it was reasonable to seek current bids from contractors for such costs. Stainsby also agreed that given the underlying litigation, the parties' ability to get things done in his suggested ninety-day time frame would be affected. Moreover, both Stainsby and Carlson testified that it would be reasonable for Farmers to request bids from a contractor, who would be expected to view the property. Following Nelsons' rejection of the joint appraisal, Farmers immediately sought bids for the replacement costs and little, if any, of the delay between March of 1993, and the receipt of Peterson's revised bid in June 1994, can be attributed to Farmers. In short, Nelsons provided no evidence to establish that Farmers' actions violated MUTPA.

¶45 Therefore, based on the evidence, we conclude the District Court did not err in concluding that there was a failure of proof for Nelsons' claims under §§ 33-18-201 (4) and (6), MCA.

17

¶46    We further conclude that--Emmons' testimony aside--testimony from Stainsby and Carlson concerning Farmers' actions following the March 12, 1993 joint appraisal provided the District Court with more than sufficient evidence to conclude that Farmers did not violate MUTPA.  Accordingly, we decline to address the parties' arguments concerning pre- or post-filing actions and the application of *Palmer* and *Federated Mutual*.

¶47    Finally, we note that Farmers has requested an award of costs and attorney fees pursuant to Rule 32, M.R.App.P.  We decline to make such an award.

¶48    Accordingly, the District Court's judgment is affirmed.


/S/ PATRICIA COTTER

We Concur:


/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ TERRY N. TRIEWEILER
/S/ JIM RICE